UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINA A. NEWMAN,

              **Plaintiff,**            **CIVIL ACTION NO. 11-cv-14365**

     **vs.**

COMMISSIONER OF            **MAGISTRATE JUDGE MONA K. MAJZOUB**
SOCIAL SECURITY,

              **Defendant.**
_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [11]

Plaintiff Christina Newman seeks judicial review of Defendant the Commissioner of Society Security's determination that she is not entitled to social security benefits for her physical impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 9) and Defendant's Motion for Summary Judgment (docket no. 11). With consent of the Parties, this case has been referred to the undersigned for final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket no. 15.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

## I.    PROCEDURAL HISTORY:

Plaintiff filed an application for Disability Insurance Benefits and an application for Supplemental Social Security Income with protective filing dates of July 2, 2008, alleging that she had been disabled since February 26, 2008, due to chronic back problems caused by a work-related injury. (TR 105-110.) The Social Security Administration denied benefits. (TR 46, 50.) Plaintiff

requested a *de novo* hearing, which was held on March 3, 2010, before Administrative Law Judge (ALJ) Oksana Xenos, who subsequently found that Plaintiff was not entitled to benefits because she was capable of performing a significant number of jobs in the national economy.  (TR 24-25.)  The Appeals Council declined to review the ALJ's decision (TR 1), and Plaintiff commenced the instant action for judicial review.  Plaintiff and Defendant each filed their Motions for Summary Judgment.

## II.   PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff was 32 years old at the time of the administrative hearing and 30 years old at the time of alleged onset.  (*See* TR 28.)  Plaintiff has past work experience as a waitress and a housekeeper.  (*See* TR 120.)  Plaintiff testified that she hasn't worked since February 26, 2008, when she slipped in a bathtub while working as a housekeeper at a Holiday Inn.  (TR 29.)  At the time of the hearing, Plaintiff had no source of income.  (TR 30.)  She testified that she cannot do much at all because of her back.  (TR 30.)  Plaintiff indicated that she rarely gets up to do housework and "can't even get on the computer for more than 10, 15 minutes to help [her] kids."  (TR 30.)  Plaintiff testified that she lives with her husband and her two sons; her daughter does not live with them.  (TR 28.)  Plaintiff has a ninth-grade education.  (TR 29.)

Plaintiff testified that when she injured her back, she had "some lower back pain," but mainly, her problem was "shooting pains in [her] leg."  (TR 34.)  Plaintiff had surgery in July 2008, but while "the surgery . . . stopped some of the shooting pains . . . , it seems like it made the back pain worse."  (TR 34.)  She testified that she can only sit for 15 to 20 minutes in any one position, and that she needs to get up and move or lay down.[1]  (TR 34-35.)  She testified that she can only

---

[1]It appears that Plaintiff needed to stand during her testimony.  (TR 33.)

2

walk about one block and that she would have to lay down and rest to continue further.  (TR 35.)
Plaintiff also testified that she can only lift about a half a gallon of milk.  (TR 35.)  Plaintiff told the
ALJ that she needs to take lots of breaks during a normal day because of the pain; she also indicated
that if she tries to do laundry or let the dogs out, she ends up in bed "for two days straight."  (TR 35-
36.)  Plaintiff testified that she has gained 40 to 50 pounds due to inactivity and that she used to be
"very active;" "[she] used to roller blade, skate, play ball with [her] kids."  (TR 33-34.)  Plaintiff
testified that she cries a lot because she can't play catch with her kids when they ask her to play with
them.  (TR 34.)

Plaintiff testified that following surgery, she tried epidural injections, but they did not seem
to help her pain.  (TR 36.)  She also tried physical therapy with no success, and as of the time of the
hearing, she used a TENS unit regularly.  (TR 36.)  Plaintiff indicated that she uses a cane to
ambulate longer distances and that she uses a back brace when she goes on long car rides.  (TR 29.)
Plaintiff testified that she also takes medication, which "eases the pain" but "doesn't take it away."
(TR 30.)

Plaintiff testified that on a normal day, she gets up around 7:00 a.m. to 7:30 a.m. and tries
to help her kids get ready for school.  (TR 31.)  Plaintiff noted, however, that her kids are old enough
that they typically get their own breakfasts, so she spends the morning "mainly laying around, sitting
around, trying to walk it out."  (TR 31.)  Plaintiff testified that she drives short distances "if need
be" but that her daughter just got her license, "so she does a lot of the driving."  (TR 31.)  When
asked about her personal care, Plaintiff testified, "I do okay dressing and showering but if I bathe
and I hate to say it but my daughter shaves my legs for me.  I do need help getting up from the sitting
position in the bathtub but I can step in and out of the shower okay."  (TR 31.)  Plaintiff stated that
she has friends come over to he house to watch movies on occasion.  (TR 32.)  Plaintiff told the ALJ,

3

"I wish I could work.  I'm not a lazy person at all.  I really with I could do something and if I could, I would be out there doing it right now."  (TR 37.)

### B.      Medical Record

Plaintiff's emergency-room records indicate that she was diagnosed with low back strain caused by her slip in the bathtub on February 26, 2008.  (TR 187.)  Her MRIs show small bilateral hip joint effusions and mild osteoarthritis of the scroiliac joints as well as large disc extrusion at the L5-S1 level compressing the intradural segment of the right S1 nerve root, together with degenerative changes and an annular tear in the L4-L5 intervertebral disc.  (TR 180-81.)

Shortly after her injury, on March 17, 2008, Plaintiff presented to Dr. Peter Samet at Spine, Sports & Occupational Medicine, P.C.  (TR 245-49.)  She complained of "low back pain traveling into her right lower extremity all the way down to her right ankle," and she indicated that "[i]t tends to be worse with prolonged sitting or standing."  (TR 246.)  Dr. Samet conducted a spinal examination and found lumbar paraspinal muscle spasms on the right side and focal tenderness in the sacroiliac joint on the right side.  He reviewed Plaintiff's MRIs and opined that her "[l]ow back pain is secondary to a herniated disc at L5-S1, possibly causing a lumbar radiculopathy." (TR 248.) Dr. Samet gave her an injection in her sacroiliac joint, refilled prescriptions for Flexeril and Vicodin, placed her on a Medrol Dosepak, ordered physical therapy three times a week for four weeks, and ordered an EMG.  (TR 249.)  He opined that Plaintiff was "disabled from employment and performing household chores" until April 17, 2008, at which time she was to be reevaluated.  (TR 249.) Dr. Samet ultimately extended disability assessment through at least June 12, 2008.  (*See* TR 262, 264, 265.)

On May 15, 2008, through a referral from Dr. Samet, Plaintiff presented to Dr. Miguel Lis-Planells, a neurosurgeon also with Spine, Sports & Occupational Medicine, P.C.  (TR 240-44.)

4

Plaintiff reported back pain at a 2-3 on a scale of 10 and pain in her "right buttock radiating to the dorsal aspect of the side, dorsal calf and into the heel area" at a 10 on a 10-point scale. (TR 240-41.) She indicated that her pain was "partially relieved by laying down." (TR 241.) Dr. Lis-Planells noted that Plaintiff had difficulty getting on and off of the examination table. (TR 242.) He also noted that her gait was "severely antalgic with limping in the right lower extremity" and that she was assisted with a cane. (TR 242.) He reviewed her MRI and EMG and recommended either "selective injection" for "temporary relief" or "surgical intervention," which he noted would be the better option in Plaintiff's case. (TR 243.) He recommended a microdiscectomy rather than spinal fusion, but he noted that "[u]nfortunately, this has a significant chance of requiring fusion in the future, *if the patient develops intractable back pain*." (TR 243 (emphasis added).) He also noted that Plaintiff was "disabled, and she is in the need of housekeeping aide for household duties." (TR 244.)

Plaintiff returned to Dr. Lis-Planells on June 12, 2008 and reported no improvement. (TR 237.) Plaintiff informed Dr. Lis-Planells that she wanted to proceed with L5-S1 laminectomy and microdiscectomy, which he opined would have an 80% to 90% chance of providing long-term pain relief. (TR 238.) He also noted that Plaintiff had "lumbar disc degeneration and that she may require spinal fusion in the future." (TR 238.)

In July 2008, Plaintiff had a bilateral laminectomy and discectomy; she followed up with Dr. Lis-Planells on July 24, 2008. (TR 235-36.) Plaintiff reported that "her radicular pain ha[d] resolved and her back pain [was] slowly improving." (TR 235.) Dr. Lis-Planells noted that her gait was short-stepped but well balanced with a walker. (TR 235.) About two weeks later, Plaintiff returned for a second follow-up evaluation, where she again indicated a resolution of her leg pain

and an improvement in her back.  (TR 299-300.)  He ordered Plaintiff to start a post-operative rehabilitation program.  (TR 300.)

On September 22, 2008, Plaintiff returned to Dr. Lis-Planells with increased back pain when standing.  (TR 297.)  Plaintiff reported that aquatic therapy was helpful but that the pain returns when she gets out of the pool.  (TR 297.)  Dr. Lis-Planells noted that "[t]his is all consistent with lumbar disc degeneration," which was consistent with his pre-surgical opinion.  (TR 297.)  He ordered an MRI, X-rays, and a series of epidural injections.  (TR 297.)  He also ordered her to discontinue physical therapy.  (TR 297.)

In October 2008, Plaintiff obtained the first of her epidural injections; she reported to Dr. Lis-Planells on November 10, 2008, and indicated that "she had about three or four days of pain relief, following which her back pain . . . slowly returned."  (TR 291.)  She was again ambulating with a cane.  (TR 291.)  Dr. Lis-Planells noted that Plaintiff continued "to have severe discogenic back pain" and that they would "proceed with a second epidural injection."  (TR 291.)  He also ordered her a TENS unit and noted that they were "making every effort possible to control her discogenic back pain and avoid spinal fusion."  (TR 292.)

On December 8, 2008, Plaintiff returned for another follow-up visit.  (TR 284-85.)  Plaintiff reported that her second epidural injection also provided only three or four days of pain relief.  (TR 285.)  Dr. Lis-Planells ordered Plaintiff to continue home exercises and the use of her TENS unit; he also ordered her to wear a lumbar brace.  (TR 284.)  He opined that Plaintiff's September 30, 2008 MRI showed "a small seroma in the post-operative tissues and severe disc degeneration of L5-S1."  (TR 284.)  He also noted mild disc degeneration at L4-L5.  (TR 285.)  Dr. Lis-Planells noted that they would "proceed with the plan of continuing conservative care" until Plaintiff returned in January 2009.  (TR 285.)  On December 12, 2008, Dr. Samet reported similar findings; he also noted

6

that Plaintiff was taking Vicodin HP three to four times per day. (TR 322.) He gave her a sacroiliac joint injection and ordered that she "hold[] off on another epidural injection." (TR 322.)

On December 29, 2008, Dr. Samet wrote a note asking that Plaintiff be excused from jury duty due to "lumbar disc herniation" and "sacroiliitis." (TR 320.) He noted that "any prolonged sitting and/or standing will definitely exacerbate her low back symptoms." (TR 320.) During an evaluation that same day, Dr. Samet noted that "the last injection I gave her did not help as much as it had in the past." (TR 319.) He noted that Plaintiff "does not wish to have any more procedures done" and that they would "try to achieve better pain control." (TR 319.)

On January 29, 2009, Plaintiff returned to for her next follow-up appointment. (TR 282-83.) She indicated no improvement and informed Dr. Lis-Planells that she was "not interested in any further procedures" and that "she did not have much relief from previous injections." (TR 282, 283.) Dr. Lis-Plannels noted that Plaintiff "continues to have back pain in the lumbar area when standing, sitting or walking for more than 10 to 15 minutes." (TR 282.) He noted that Dr. Samet had started her on a Duragesic patch for the pain but that it caused nausea and vomiting; he lowered her dosage. (TR 282.) He opined that Plaintiff was still "disabled and in need of housekeeping assistance for household duties." (TR 283.) Dr. Samet reported similar findings during a January 26, 2009 evaluation. (TR 318.)

On February 23, 2009, Plaintiff returned to Dr. Samet. She indicated that the Duragesic patch was still causing nausea and vomiting and that it was not helping her pain. (TR 316.) Even though it "did not help her pain completely," Dr. Samet believed that "Vicodin HP would be the best route for her, as opiates in general cause her to feel nauseated." (TR 316.) On March 23, 2009, Plaintiff indicated that her pain was "fairly well controlled with Vicodin HP" but that "[t]he pain tends to be worse with prolonged standing." (TR 314.)

7

On May 18, 2009, Plaintiff reported that she still had pain in her low back and that it was also going down her right lower extremity. (TR 312.) She indicated that her prescription for Norco 10/650, which had replaced her Vicodin, was providing some relief but not as much as she had hoped. (TR 312.) Dr. Samet gave her another sacroiliac joint injection and refilled her prescription. (TR 312.) On July 13, 2009, Plaintiff reported continued low back pain with radiation into her right lower extremity. (TR 310.) She noted that she was taking four to six Norco 10/650 every day and using her TENS unit, which provided "some relief of her pain." (TR 310.) On September 14, 2009, Plaintiff reported that the back pain "overall ha[d] been doing much better until . . . she performed increased activity due to moving, [which] caused a flare-up." (TR 308.) On November 9, 2009, Plaintiff reported "some pain in her low back that goes into her right lower extremity, as well as some cramping and paresthesias." (TR 306.) Dr. Samet noted that her condition "remains essentially unchanged" and that "at this point, her chronic condition has stabilized." He indicated that the "[p]lan is to maintain her pain as best possible with her medications." (TR 306.)

On February 8, 2010, Dr. Samet completed an RFC Questionnaire related to Plaintiff's lumbar spine. (TR 232-327.) Dr. Samet indicated that Plaintiff's condition consisted of "constant pain" in her lower back and right leg and that she had a significantly reduced range of motion due to her condition. (TR 324.) He indicated that her straight leg raising test showed a limit of 45° on her right leg and that she had abnormal gait, sensory loss, and reflex changes. (TR 325.) Dr. Samet noted that Plaintiff's pain was severe enough to often interfere with her attention and concentration, that her medication caused nausea, and that her prognosis was guarded. (TR 325.) He opined that Plaintiff could walk approximately one block, that she could sit for approximately 30 minutes, that she could stand for approximately 20 minutes, and that she could only sit and stand or walk for less than two hours in an eight-hour work day. (TR 325-26.) He also opined that in an eight-hour work

8

day, Plaintiff would need to walk for about five minutes every fifteen minutes and that she would

need a sit/stand option to perform a job.  (TR 326.)  Dr. Samet noted that Plaintiff would need to

take unscheduled breaks throughout the work day and that she would need to use a cane to ambulate.

(TR 326.)  He noted that Plaintiff could rarely lift less than 10 pounds and that she should never lift

10 pounds or more.  He also noted that she should never twist, stoop, crouch, climb ladders, or climb

stairs.  (TR 327.)  Finally, Dr. Samet opined that Plaintiff would likely be absent more than four

days per month due to her condition.  (TR 327.)

###### C.       The Vocational Expert

The ALJ asked the VE to consider an individual who (1) was of the same age, education, and

past work experience as Plaintiff; (2) was limited to light work; (3) was unable to climb ladders; (4)

could occasionally climb stairs and ramps; (5) and could occasionally balance, stoop, kneel, crouch,

and crawl.  (TR 38.)  The VE testified that such an individual could work in "quite a variety of jobs,"

at which time the VE listed positions that totaled approximately 99,000 jobs.  (TR 38.)

The ALJ then asked the VE to assume that the same individual would require a sit–stand

option.  (TR 39.)  The VE testified that with this added limitation, the total number of available jobs

would be reduced to approximately 25,000 jobs.  (*See* TR 39.)  When adding a requirement that the

individual only lift up to five pounds and only walk one block before having to stop and rest for five

minutes, the VE testified that the number of jobs would be reduced to approximately 17,000 jobs.

(*See* TR 40.)

The ALJ then asked the VE to assume that the individual could only stand for up to two

hours in an eight our day and could sit six hours in an eight-hour day.  (TR 40.)  The VE testified

that there was "quite a variety of sedentary, unskilled jobs to consider," including 4,000 clerical

handling jobs; 2,000 inspector jobs; 2,000 bench assembler jobs; 4,000 surveillance system monitor

jobs; and 2,000 security receptionist jobs. (TR 40-41.) When asked to consider that the same individual would be unable to sit, stand, or walk a total of eight hours in a work day five days a week, the VE testified that there would be no jobs available for such an individual. (TR 41.)

## III.   ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through September 30, 2009; had not engaged in substantial gainful activity since February 26, 2008; and suffered from severe spine disorder, obesity, and osteoarthritis; she did not have an impairment or combination of impairments that met or equaled the Listing of Impairments. (TR 14.) The ALJ found that Plaintiff's allegations regarding the extent of her symptoms were not totally credible (TR 16), and he gave "some weight" to one portion of Dr. Samet's opinion and "little weight" to another portion of Dr. Samet's opinion. (TR 17.) The ALJ found that although Plaintiff could not perform her past work, she had the ability to perform a limited range of sedentary work, and there were jobs that existed in significant numbers in the economy that Plaintiff could perform. (TR 24-25.) Therefore, she was not suffering from a disability under the Social Security Act at any time from February 26, 2008, through the date of the ALJ's decision. (TR 19.)

## IV.   LAW AND ANALYSIS

### A.   Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938));

*Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases *de novo*, resolve conflicts

in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human*

*Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the

administrative record as a whole.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536

(6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by

substantial evidence, it must be affirmed, even if the reviewing court would decide the matter

differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial

evidence also supports the opposite conclusion.  *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir.

1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial

evidence standard "presupposes that there is a zone of choice within which the decisionmakers can

go either way, without interference by the courts").

**B.      Framework for Social Security Determinations**

Plaintiff's Social Security disability determination was made in accordance with a five-step

sequential analysis.  In the first four steps, Plaintiff was required to show that:

(1)      Plaintiff was not presently engaged in substantial gainful employment; and

(2)      Plaintiff suffered from a severe impairment; and

(3)      the impairment met or was medically equal to a "listed impairment;" or

(4)      Plaintiff did not have the residual functional capacity (RFC) to perform relevant past
         work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work,

the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work

experience to determine if Plaintiff could perform other work.  If not, Plaintiff would be deemed disabled.  *See id.* at § 404.1520(g).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C.    Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)).  Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing. 42 U.S.C. § 405(g).  Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).  Although Plaintiff's argument is not clearly organized or articulated, it appears that Plaintiff argues that Defendant's decision should be reversed for three reasons: (1) the ALJ failed to properly weight the medical opinions of record; (2)

12

the ALJ failed to properly evaluate Plaintiff's credibility; and (3) the ALJ's RFC is not supported by substantial evidence.  (Docket no. 9 at 12.)

### 1.        Weight of the Medical Opinions

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  It is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician.  *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008).  Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight."  *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)).  The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant.  20 C.F.R. § 404.1527(c)(1).  The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist.  20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion."  20 C.F.R. § 404.1527(c)(2).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)).  If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the

13

treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Plaintiff argues that Dr. Samet's opinion, in the form of his February 2010 RFC, is entitled to controlling weight because "there is not evidence to contradict Dr. Samet's assessment and opinion." (Docket no. 9 at 15-16.) Plaintiff asserts that the ALJ erred when he found that a portion of Dr. Samet's opinion was "out of proportion" with objective testing because "[t]he ALJ is not a doctor and does not have expertise" to make this determination. (*Id.* at 18.) Plaintiff contends that Dr. Samet's opinion and notes are consistent with Dr. Lis-Planells's notes, and there is nothing to contradict their findings. (*Id.*) Defendant argues that the ALJ is charged with evaluating the evidence, including the physician's opinions, and that the ALJ did not err when she adopted one portion of Dr. Samet's opinion and rejected another. (Docket no. 11 at 18-23.)

The ALJ discussed Plaintiff's medical record as set forth herein, but when she ultimately discussed Dr. Samet's opinion, the ALJ stated as follows:

> Dr. Samet prepared a lumbar spine residual functional capacity questionnaire on the claimant's behalf. Dr. Samet's opinions regarding the claimant's sit/stand/walk and lifting limitations are given some weight because they are consistent with [the] objective medical record. However, Dr. Samet's opinion that the claimant would likely be absent from work more than 4 days a month as a result of her impairments or treatment is given little weight. This opinion is out of proportion with the objective medical record and Dr. Samet's treatment plan for the claimant.

(TR 17.)

Dr. Samet opined that Plaintiff could walk approximately one block; sit for approximately 30 minutes; stand for approximately 20 minutes; and sit, stand, or walk for less than two hours in an eight-hour work day. (TR 324-36.) He further opined that in an eight-hour work day, Plaintiff would need a sit/stand option and that she would need to take unscheduled breaks throughout the day. (TR 326.) Dr. Samet also noted that Plaintiff could not lift more than 10 pounds; that she could not twist, stoop, crouch, climb ladders, or climb stairs; and that she would likely miss four or more days each month due to her conditions. (TR 327.) The ALJ's RFC for Plaintiff indicated that Plaintiff could walk for one block before having to rest and could sit for six hours and walk for two hours in an eight-hour work day. (TR 15.) The ALJ further indicated that Plaintiff would require a sit/stand option. (TR 15.) The ALJ also found that Plaintiff could lift up to five pounds; that she could not climb ladders; and that she could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. (TR 15.) Thus, it appears that the ALJ adopted Dr. Samet's opinion that Plaintiff could walk approximately one block; that she required a sit/stand option; that she could not lift more than 10 pounds; and that she could not climb ladders. It appears that the ALJ partially adopted Dr. Samet's opinion that Plaintiff could not twist, stoop, crouch, or climb stairs. And it appears that the ALJ rejected Dr. Samet's opinion that Plaintiff could sit, stand, and walk for less than two hours in an eight-hour work day; that she would need to take unscheduled breaks throughout the day; and that she would likely miss four or more days each month.

The ALJ's statement that she gave "some weight" to Dr. Samet's opinions regarding Plaintiff's sit/stand/walk and lifting limitations is not sufficiently specific to make clear to the Court the weight she gave to this portion of Dr. Samet's opinion because the weight she gave to this broad area of Dr. Samet's opinion varies throughout the RFC. Moreover, the ALJ's statement that she

gave "little weight" to Dr. Samet's opinion regarding Plaintiff's need to miss four days or more each month is inconsistent with the RFC; the ALJ appears to have rejected this opinion entirely.

Defendant argues that "[t]he ALJ simply disagreed [with Dr. Samet's opinion] – based on the totality of the medical evidence, the limited objective findings after Plaintiff's successful surgery, and the conservative plan of care thereafter – with Plaintiff's contention that she would need to actually be able to 'lay down' throughout the day and with Dr. Samet's contention that Plaintiff could not work on a sustained basis." (Docket no. 11 at 20-21.)  In support of this argument, Defendant draws the Court's attention to Plaintiff's successful laminectomy and discectomy, her "mild" disc bulges and "mild" degenerative changes, her lack of radicular pain, and the conservative care given by her physicians.  (*Id.* at 21.)

While this evidence on its own may be compelling, it is a mere scintilla of the record as a whole.  Like the ALJ, Defendant focuses almost entirely on the positive aspects of Plaintiff's recovery.[2]  (*See* TR 16-17.)  While her surgery was successful in eliminating her radicular pain, two months later, Plaintiff returned to Dr. Lis-Planells with increased back pain when standing.  (TR 297.)  Dr. Lis-Planells noted that "[t]his is all consistent with lumbar disc degeneration," which was consistent with he pre-surgical opinion that her surgery may not solve her back problems.  (TR 297.) He and Dr. Samet treated Plaintiff with a series of epidural and sacroiliac join injections over the next few months.  (TR 291, 285, 322.)  Additionally, Plaintiff continued to take three to four doses of Vicodin HP each day.  (TR 322.)  Yet despite this course of care, Plaintiff continued to present

---

[2]The Parties agree that Plaintiff's July 2008 surgery was largely successful in reducing or eliminating her lower-extremity radicular pain.  Thus, the Court's focus for purposes of Plaintiff's claim is on her post-surgical lower-back pain and any recurring radicular pain. Therefore, the Court will focus on the ALJ's discussion of Plaintiff's post-surgical medical evidence.

with lower-back pain. And while the doctors both noted that their course of case was "conservative," they also noted that this was because Plaintiff "does not wish to have any more procedures done," so they would "try to achieve better pain control." (TR 319.) And while Dr. Samet noted that Plaintiff's "chronic condition has stabilized," he did not indicate that it was resolved; instead, he stated that the "[p]lan is to maintain her pain as best possible with her medications." (TR 306.)

It appears that the ALJ found Plaintiff's care to be "conservative" because she elected not to undergo additional surgery. But Plaintiff's physicians did not recommend against surgery; to the contrary, her records imply that she is a candidate for spinal fusion sometime in the future. (*See* TR 243, 292, 297.) Her choice not to undergo surgery does not imply that she is not disabled. *Stennett v. Comm'r*, 476 F.Supp.2d 665, 672 (citing *O'Nan v. Sect'y of HHS*, 1988 WL 26062, *3 (6th Cir. 1988) ("There can be no question that this lady had a bad back, and we are not prepared to say that she had to submit to the surgeon's knife in order to prove it.")). Like the claimants in *O'Nan* and *Stennett*, Plaintiff should not be required to undergo a second surgery to prove that she has chronic back pain.

The ALJ's failure to clearly articulate the weight given to Dr. Samet's opinions and the good reason for that decision would, in itself, require remand. Moreover, the Court finds that the ALJ erred in not affording Dr. Samet's opinion controlling weight. Dr. Samet has been Plaintiff's treating physician with regard to her back injury since March 2008, approximately one month after her injury; he has evaluated Plaintiff on a monthly or bi-monthly basis since that time; he has played an integral part in her treatment plan; his opinions are supported by the great weight of the evidence; and he has worked closely with Dr. Lis-Plannels, Plaintiff's neurosurgeon, in treating Plaintiff's chronic back problems. If this matter were remanded under sentence four, the Court would order

17

the ALJ to afford controlling weight to Dr. Samet's opinion.  Therefore, the Court has afforded Dr. Samet's opinion controlling weight in reversing the Commissioner's decision.

### 2.      Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997).  But Credibility assessments are not insulated from judicial review.  Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence.  *Id.*  An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'"  *Id.*  "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2).  The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than

18

medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

The ALJ found that "[t]he claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (TR 16.) Then, after discussing the medical evidence as noted herein, the ALJ stated as follows:

> The medical records and the testimony of the claimant describing her limitations demonstrate that such limitations will not interfere with her ability to function independently, appropriately, effectively, and on a sustained basis. The undersigned has considered the claimant's allegations and has found them inconsistent with the objective medical findings in the record. The claimant's testimony is not well supported by the objective medical evidence in the record and, while given appropriate consideration, it was not given significant weight.

(TR 17.)

It appears that the ALJ's decision to discredit Plaintiff's testimony was based entirely on her interpretation of the objective medical evidence. Such a rationale is inappropriate. " 20 C.F.R. § 416.929(c)(2). The ALJ failed to consider any of the factors set forth in Section 416.929(c), most of which support Plaintiff's testimony: (1) Plaintiff cannot perform household chores, and she asks her daughter to help shave her legs; (2) Plaintiff has continuously reported increasingly painful lower back pain; (3) Plaintiff takes high doses of narcotics and has taken a series of epidural and sacroiliac injections, all of which only provided temporary relief; (4) and she uses at TENS unit to try to relieve her pain. Moreover, to the extent the ALJ relied on her "conservative care" as a reason to discredit her testimony, such a determination was error for the reasons stated herein. *See* section IV.C.1, *supra*. Therefore, the Court finds that the ALJ's credibility determination is not supported by substantial evidence.

19

### 3.      Plaintiff's RFC and the Court's Determination

The ALJ found that Plaintiff

. . . has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can lift up to 5 pounds; can sit for 6 hours and stand/walk up to 2 hours in an 8 hour workday; cannot climb ladders; can occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl; can walk 1 block before having to stop and rest for 5 minutes; and requires a sit/stand option.

(TR 15.)  In light of the Court's findings herein, the ALJ erred when she found that Plaintiff could sit, stand, and/or walk for a total of eight hours in a work day five days a week.  As noted, Dr. Samet opined that Plaintiff could only sit, stand, or walk for less than two hours in an eight-hour work day. (TR 325-26.)  Dr. Samet's statement is supported by his findings (*see* TR 306-22) and by Dr. Lis-Plannel's findings (*see* TR 282-300).  Additionally, Plaintiff testified that she could not sit in any one position for more than 15 to 20 minutes and that she had to move and stand up or lay down.  (TR 34-35.)  The Court finds no objective evidence to suggest that Plaintiff's RFC should have excluded this limitation.

Even if the Dr. Samet's opinion limiting Plaintiff to less than two hours of sitting, standing, or walking in an eight-hour work day was excessive, however, the VE's testimony is enlightening:

Q . . . Please assume . . . the individual cannot sit, stand and/or walk a total of eight hours in a work day five days a week on a regular and continuing basis.  Any jobs with that RFC and given profile?

A There are no jobs.

(TR 41.)  Thus, given the VE's testimony, even if Plaintiff should only be limited to sitting, standing, or walking for three, four, five, six, or seven hours in an eight-hour work day, the Court finds that Plaintiff's impairments preclude her from any gainful employment.  Therefore, the Court finds that Plaintiff has been under a disability since February 26, 2008, and will order that this

20

matter be remanded under sentence four of 42 U.S.C. § 405(g) for a determination of benefits.

Accordingly, **IT IS ORDERED**, that Plaintiff's motion for summary judgment is **GRANTED**; that Defendant's motion for summary judgment is **DENIED**; and that decision of the Commissioner is reversed.  This matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).


Dated:  March 6, 2013           s/ Mona K. Majzoub_____
                                MONA K. MAJZOUB
                                UNITED STATES MAGISTRATE JUDGE



<u>**PROOF OF SERVICE**</u>

I hereby certify that a copy of this Order was served upon Counsel of Record on this date.

Dated: March 6, 2013            s/ Lisa C. Bartlett_____
                                Case Manager